Thank you, Your Honors, and may it please the Court. My name is Brent Johnson. I am Pro Bono Counsel for Petitioner Andre Costa Soares. I would like to reserve two minutes for rebuttal, and I will watch the clock. Today I will focus my argument on Mr. Costa Soares' fear of torture in Brazil. As this Court stated in De Leon v. Garland, when the agency fails to consider probative evidence of likelihood of torture in an individual's country, that decision cannot stand. And that is exactly what happened here in this case. The BIA and the IG failed to consider evidence, first, of Mr. Costa Soares' mental illness and related symptoms, and second, country conditions showing affirmative abuse and torture by Brazilian law enforcement. Now, turning first to the mental illness, or evidence of Mr. Costa Soares' mental illness and symptoms, it is undisputed... Excuse me, Counsel. You said that the BIA didn't consider it, but they did consider it. They disagreed with it. They talked about the respondent's mental disability combined with race and sexual orientation, so they considered it. What evidence do you have that they didn't think about this question? Certainly, Your Honor. The problem here is that there was no consideration given in the analysis. Let me stop you right there and read from the BIA's decision. Court acknowledges evidence in the record notes concern regarding reports of abusive individuals in mental health institutions and jails. And citation. However, there's not sufficient evidence to establish so on and so forth. So to come in and tell us they didn't consider in the face of statements like that just kind of misses the mark. They plainly acknowledged the existence of evidence. They said there wasn't sufficient to persuade them. That's different. Well, Your Honor, that's... I apologize. That's the second issue that I'm planning on getting to. In that sentence, the IJ considered evidence of conditions, whether the poor conditions in prison. As you can see on that, I think that's in AR-92, the IJ, she acknowledges abuse, but then she goes on the only analysis... The court acknowledges that the respondent suffers from an untreated mental health condition. So they acknowledge that, too. They're simply not persuaded. That's an important distinction. So to come in and tell us they didn't consider and to cite case law that says failure to consider requires us to remand, that misses the mark. They did consider. They weren't persuaded. That's different. And they weren't persuaded because there was a necessary chain of events that didn't combine to make things more likely than not, that he would continue to be untreated, that he would be institutionalized, and that the particular institution would be torturing him, and so on and so forth. I mean, they went through that whole explanation. And why are we compelled to find to the contrary? That's our standard of review. Yes, Your Honor. The evidence shows, or it's undisputed, that Mr. Cortez-Suarez suffers from a severe mental illness, schizophrenia. And then that mental illness manifests itself through very extreme behavior. This includes paranoid delusions. Throughout his time in detention, he would smear feces and urine over the cells, screaming at the top of his lungs, banging, kicking on his cell door. And his behavior was so extreme that he was convicted twice for destruction of prison property while in prison, adding additional three years to his sentence. He had at least 22 disciplinary write-ups. And he spent years isolated in segregation while detained because of his behavior. I think that point is well taken. In other words, there's a series of events that has to happen. The BIA's opinion, I think, fairly summarizes that there was a speculative sequence that had to occur. And I think your point that you're making is that on the front end of the sequence, you don't think of that as speculative because it's undisputed that your client has a mental illness and that he's had this track record of not taking his medication and getting into trouble, if I can summarize it that way. But what about the back end of the sequence, which is that I think would require you showing that the country conditions are such that he would be targeted if he were hospitalized or institutionalized? Yes, Your Honor. So on the back end, the country conditions again show, as the UN Special Rapporteur on Torture stated in the report, they stated that abuse and torture committed by Brazilian law enforcement is so common that it is, quote, a matter of course, and pervasive among Brazilian law enforcement and prison guards. This abuse includes severe beatings, suffocation, kicking. The U.S. State Department found one prison guard systemically breaking the fingers of prisoners in order to immobilize them. Another independent report found the use of anal impalement, the piercing of feet with nails, and forcing individuals to remain in stress positions for a prolonged period of time. These are intentional acts intended to cause severe pain and suffering, which is the definition of torture. And the problem here, again, going back to Judge Clifton's original question, this doesn't get considered in the IG's analysis. At AR-91, she does say she acknowledges abuse there by law enforcement. But then the rest of the analysis is simply about poor conditions in prison, which is not the argument that was made by the counsel. You can see at AR-43, the appeal to the BIA, Mr. Costa Suarez, the former counsel, was very explicit in stating that the argument is not that poor conditions amount to torture. The argument is that there is evidence of affirmative abuse committed by Brazilian law enforcement intended to cause pain and suffering. And it's that affirmative abuse that would be the torture. And, again, this does not get considered anywhere in the IG's decision, as all the cases headed by the IG are only relevant to poor conditions. And as this court stated in Matter of Guerra, which was a Mexican mental health claim, there where the BI relied on viegas, which is one of the cases the IG relies on, stating that poor conditions amount to torture, this court remanded because, in part, the argument had not necessarily been about conditions. And the court says in Guerra that when the argument is not simply about conditions, viegas has little precedential weight. And that's exactly what the argument is here. The argument never was poor conditions. It was these affirmative acts of abuse by law enforcement, which are not mentioned at all in the analysis. And this is exactly like in De Leon v. Garland, where, again, there the IG failed to consider and address highly probative country conditions. And this court remanded, proceeding, as this court stated, that decision could not stand, and the case was remanded. And going back again to Mr. Costa Suarez's mental illness, to the original point, evidence of his mental illness also did not get considered in the IG's analysis. The IG does begin at AR-91 by acknowledging that he has a mental illness. However, in her very next sentence, she immediately diminishes the problems that that would cause him in Brazil by stating that his mother is in Brazil. That will make him more likely to get treatment. That is pure speculation that's not supported by the record. That's a clear error. She then goes on to say... How can you say that, not supported by the record? In fact, it is true that his mother is in Brazil, correct? Yes, Your Honor. And it is true when he was in Brazil, he didn't behave at the same level. Well, there is evidence. It's not evidence you find persuasive. Maybe it's not evidence I find persuasive. But don't tell me there's no evidence in the record. Repeatedly tell me that when, in fact, there is. And where the IG's decision acknowledges it. There's a difference between no evidence and not persuasive. That's like the third time I've said that to you. So, that sank in. Do you find persuasive? Yes, Your Honor. On AR-91, the IG acknowledges, later on, that there's no evidence that Mr. Costa Suarez had this mental illness when he previously lived in Brazil. So, the past behavior in Brazil is not predictive of how he would act in the future. At AR-868, Mr. Costa Suarez, in his declaration, affirmatively states he will not accept any medication. He never has accepted medication. He never will. So, while there is evidence that Mr. Costa Suarez's mother does live in Brazil, there's no actual evidence in the record to show that he would be more likely to take or accept any medication or treatment while living in Brazil. I don't have difficulty seeing a link. If his mother gives him direction, he may be more likely to follow it if she's there than in this situation where he's thousands of miles away. It may not be persuasive to you. It may not be persuasive to me, but it's evidence. Understood, Your Honor. And the IJ goes on to say, well, even if he, in her next paragraph, she goes on to say even if he does not obtain or seek treatment or medication in Brazil, he still won't be likely to be singled out for torture. But the only thing the IJ cites to in support of that are general country conditions. In that paragraph, she doesn't actually address his actual symptoms. And, again, this misses the argument because the question from the IJ is not whether anyone with any mental illness of any severity would be singled out by Brazilian law enforcement. The question from the IJ is whether Mr. Costa Suarez, specifically with his specific illness and unique symptoms that have caused him to be singled out by law enforcement here in the U.S. would be singled out. So this is why it seems to be problematic for you. But I might be missing something. But on ER 91, it says the record does not indicate when the onset of respondent's mental illness occurred. Was there evidence in the record of when the onset occurred? Because feeling that what the IJ had was a track record, it seems to me to be that he wasn't getting into trouble when he was in Brazil and having these problems. Well, as the IJ notes, there's no evidence that Mr. Costa Suarez had this mental illness when he previously lived in Brazil. Mental illnesses can become onset. So that's my question. Was that admitted? Did the IJ overlook it? Or was it not in the record? No, there's no evidence of when exactly his mental illness began. Well, who bears the burden here? That's a problem. You're telling me there's no evidence. It's not proven. That may not help if your client bears the burden. Well, Your Honor, the IJ, when considering likelihood of torture, who bears the burden? The respondent bears the burden to show that he is more likely not to be tortured. The respondent in the agency. I apologize. The respondent is in the immigration court. Yes. You get confused about it all the time. But isn't that important? If it's your client that bears the burden and you tell us there's no evidence to speak to what happens to somebody with this particular conditions, then it sounds like your client hasn't borne the burden. In other words, it was up to him to demonstrate that he wasn't mentally ill when he lived in Brazil. And that's why he didn't get into trouble. As distinct from he was mentally ill, but it was better under control. Those are both logical options. But if there's no evidence to support your version, why are we compelled to agree with it? Well, Your Honor, the court, when considering likelihood of torture, needs to take the respondent as they are today. As the record shows, Mr. Cosa Suarez has continuously had this mental illness since at least, I believe, 2015. So you've given us references to general country condition reports and haven't aligned those reports with the particular condition that you're telling us we have to look at a specific condition. Okay. What evidence is there somebody with this specific condition is going to be tortured in Brazil? Yes, Your Honor. Again, the UN Special Rapporteur on Torture stated that much of these abuses, and they find, quote, gratuitous violence committed by Brazilian law enforcement, are often committed as retaliation or in response to a detainee or an individual's bad behavior. As the record shows, Mr. Costa Suarez, because of his mental illness, is extremely difficult, particularly when in a detained setting. Again, he had two felony convictions for destruction of prison property, at least 22 disciplinary write-ups, spent years isolated in segregation. This is the exact kind of behavior. This is the exact kind of behavior that when Mr. Costa Suarez acts this way in front of Brazilian law enforcement, they will respond with what the UN referred to as gratuitous violence. Counsel, I'm going to interrupt you because you have almost no time left. Yes, I apologize, Your Honor. Would you like to reserve what you've got? Yes, I would, Your Honor. All right. For planning purposes, when you come back, we'll put a minute on the clock. Thank you, Your Honor. You have about 16 seconds. You're welcome. We'll hear from opposing counsel, please. Good morning. May it please the Court, Sharon Clay on behalf of the government. As a preliminary matter, I wanted to address the motion to transfer the citizenship claim to the district court that was filed on Friday evening. Because of the timing of the actual motion, I wasn't able to confer with my supervisor or our client to take a position on that motion at this time. And I would like to just request an extension of time to respond to that motion within short order as soon as possible. Can you just give me an idea of what you're talking about in terms of how much time? Oh, you haven't seen it? No, I'm just asking how much time do you want to respond? I'm assuming that I could probably do it by the end of the week, but it's a little harder to gauge on our clients at DHS. My supervisor sees your DHS may take a little bit longer, but I do anticipate being able to respond by the end of the week. All right. So for today, you're not responding. Is that right? Well, I do want to go on a record on the case that's before the court. Well, I have a procedural question. I'm certainly willing to grant whatever time is appropriate for that. But procedurally, I didn't have time to research this yet either. But citizenship was a claim within this proceeding already, and it was rejected. So if we were to go ahead and decide the issue here based on what our standard of review is, would the petitioner have the opportunity still to institute a new proceeding in district court to establish citizenship, notwithstanding whatever we would have decided? Do you follow my question? If we affirm what happened here, is he foreclosed from pursuing this? I would have to say, like you, I haven't done the research. But my understanding is that citizenship probably can be raised at any time, sort of like a jurisdictional question. But like I said, without having had an opportunity to do the research, I don't know for sure whether or not it would be foreclosed from filing the motion to transfer or not. Does that answer your question? No, it wouldn't be a motion to transfer. That's my point. If we deny a motion to transfer and we affirm what happened below, would he still be free to file an action, a separate action in district court to establish citizenship? Under that scenario, I don't think so. I think that if you issue a decision on the merits of the citizenship claim, it may foreclose the motion to transfer. Because you're essentially, I think, saying that the lack of authenticity on the record of the documents, he hasn't met his burden of proof for establishing a probative claim for citizenship anyway. That would be my initial thought. If we were to reach the merits, as opposed to ruling on the question regarding... Correct. It's all up in the air for me. I'm sorry, could you repeat that? If we were to reach the merits, as opposed to ruling on the appropriateness of subpoenaing or not subpoenaing the witness in this immigration case, which is a different question. Correct. I think I've answered my own question. Yeah, I think you answered it for me too. It gets complicated. Citizenship comes up to us not as a direct claim or is even a claim that the agency heard by not having substantial evidence to support the inherent implicit conclusion that he didn't have a claim to citizenship. Instead, the issue that's teed up in front of us is that the immigration judge should have subpoenaed the witness, which petitioner now claims could have established citizenship. Citizenship is raised to us, not waived, but is raised, but not in a direct fashion. So I don't know what, if any, issue or preclusion might flow from our decision to an independent citizenship claim. This is a bad law school exam. Yeah, I'm not clear either, because that's the government's argument as well, is that it's sort of tangential to the actual claim. The issue raised before this court is whether or not the immigration judge had erred in not issuing a subpoena in this case. And we submitted that the claim or the issue had not been raised before the board and hadn't been exhausted. Your brief actually has a footnote that says, points out the petitioner in the opening brief doesn't challenge the denial of the motion to terminate, which is more directly directed towards citizenship. And so you argue that should be waived. And I don't, I'm not, that's how I got the word waived in there. I don't necessarily believe that because it's raised through this, you need to go out and get this witness argument. In addition, counsel, the BIA does reach the issue, which means that it is exhausted. Yes, it is. Reached it on the merits. The issue of the subpoena? No. The issue of the citizenship is exhausted. The issue of the motion to terminate on the basis of citizenship was raised to the BIA. Yes. And so in addressing generally the issues that are raised one way or the other, aside from the argument they were saying that the subpoena claim hasn't been exhausted, assuming jurisdiction, the IJ did not err in not issuing a subpoena anyway, because although the IJ do have a duty to develop the record, they do not have the burden of persuasion. And in this particular case, petitioner was actually represented by a QR who failed to actually present the witness for consideration. If you look at the record, the record actually shows that there was no attempt to have, to some degree, Mr. Rose Sr. appear in court. The alleged stepbrother was asked during the hearing whether or not the father was going to come, and he responded that he didn't ask the father to appear, and he had spoken with him the night before the hearing. He also indicated that he probably wouldn't be able to come because of his medical ailments and his diabetes, his cancer, and those types of things. So there was never really a concerted effort to have his testimony even presented for hearing. To be clear, when you say there wasn't a concerted effort, was there ever any request made that person be subpoenaed? No, there was never a request made. The issue, I think the immigration judge took issue with the QR because the QR essentially didn't really try to authenticate the citizenship claim. I think they felt, the immigration judge felt that the QR didn't expose of her duty to fully present the case, and the actual QR admitted that she had concerns about the petitioner's citizenship, and that she only presented his citizenship claim to induce her client to let her submit the CAT claim, because he essentially was arguing that he didn't have any fear of returning back to Brazil. So if we're talking about a person who's mentally ill and qualifies for a QR in the first place, I would be concerned if I thought that the IJ hadn't developed the record, because there's a special burden there. And so my read of the record is that something happened that's a little different than what you're describing. My understanding of the record is that the QR said that she honestly couldn't tell whether this is a legitimate claim, whether he really thought that he had, whether the petitioner really thought that he had a legitimate claim to his citizenship, or whether it was his mental illness talking. As opposed to the IJ suspecting that the QR hadn't done her job properly. So I just want to be very clear about the government's position on that point, please. Well, our position essentially is that the immigration judge does have a duty to develop the record. But under the regulations, whatever, it doesn't require the immigration judge to subpoena witnesses. I mean, they do have the authority and they do have the discretion. I appreciate that. But just to be clear, I am asking a different question. And just as the IJ has a duty to develop the record, and I fully appreciate that this person had representation and no request was made, as I can't see a request anywhere for this alleged father to be subpoenaed for the proceeding. But if the IJ also thought that the QR wasn't doing his or her job and hadn't fully explored this, that would strike me as a very different fact. So I want to be really clear about the government's position on that. If that's the understanding of the record, then I would like a cite to the record, please. I'm not 100%. Let me see. The record, actually, I'm not clear. I do know that the immigration judge sort of referred to the manual about the duty of the representative of the petitioner in the proceedings. I'd have to get back with you on the specifics. And I could probably respond to that with regard to the response to the motion to transfer. I could maybe elucidate that a little bit more by the end of the week. I'm not as well versed on the specifics of that part of the IJ's decision. But I am aware of the fact that the petitioner did have an opportunity to produce the father. I think he wasn't a preferred witness at the time because the stepson or stepbrother appeared in court. But even assuming, even if we were to assume that the citizenship claim and everything was purely exhausted, the government's contention would be that the documents that submitted do not establish a probative claim for citizenship. And essentially that the petitioner has sort of conceded that the documents that were submitted, having not been authenticated, are insufficient to meet his burden of proof. And that's why they would seek remand to the court below in order to have their case re-adjudicated or to be able to fully authenticate the record. With regard to the petitioner's tax claim, we would contend that the petitioner has not demonstrated that he faces a clear probability of being targeted for torture upon his return to Brazil. The record actually shows that the petitioner was not tortured in the past. He was able to live within Brazil as an openly bisexual Afro-Brazilian for 17 years without ever being arrested. Can I ask you the same? Oh, forgive me, Judge. At least some question as to whether his mental condition at that time was the same as the mental condition today. That is correct. The record of when the mental illness began to manifest. Yes, there's no evidence in the record of when it began to manifest. But as discussed earlier, that would be the burden on petitioner to actually establish when the onset actually began. And because that information is not here, it's hard to discern whether or not the fact that nothing happened to him in the past has any real bearing on it. But what I will also add to this particular case is that the examiner, Ms. Linscott, she had taken a look at this particular case and she had concluded that the petitioner's mental illness didn't necessarily contribute to his legal problems prior to going to jail. She also said that it wasn't clear if his mental health even explained all his behavior behind bars. And it is an assumption that on the front end, there's a pretty well-established track record of him being mentally ill, not taking his medication and getting into trouble, landing in jail or in an institution. These are the four assumptions. My question is, if you just assume those, my question is, is it the government's position on the back end of the sequence that there's not an individualized risk that he will be targeted for persecution or torture if he's deported on the back end? In other words, do you think the country conditions do not show that? And if so, why? The country conditions do not show that. The country conditions actually show that health care in Brazil is actually integrated into primary care. The record also shows that offenders with mental disorders do not receive sentences. They actually receive one to three years of a compulsory psychiatric treatment order. And it's based on a psychiatric review. Some of the other information is that essentially what we're arguing is we will take his word that he's mentally ill. We take his word that he may even come to the attention of law enforcement. Our argument is that, you know, as a result of that encounter, is he likely to be tortured? And our position is that he has not met that burden in this particular case, whether it's because he hadn't established individualized risk or the specific intent to harm. Petitioner has referred to the incidents in the record that show evidence of torture. But we would submit that the incidents that he relies on are not that persuasive because they actually refer to a SBT report that predates his entry into the United States. So the report is dated something like 212. So those circumstances existed at that time. With regard to the impalement and the piercing of the feet, when you looked at the record, the record actually showed that that was it did occur in 2019. But the article that describes that behavior indicated that it wasn't it shows that it's an isolated incident committed by a task force that had been sent to the prison to stop violence at a prison immediately following a riot that killed 62 people. So you're substantially over time. So I think you've answered my question. Thank you. Let me just hold on. Just let me just check. No further questions. Thank you for your argument. We're going to cut you off there, if I might. Please proceed. Thank you, Your Honors. Two quick points. Mr. Costa Suarez, it is undisputed that he does suffer from a severe mental illness that has led to many contacts with law enforcement and many other problems here in the United States. And this includes very extreme severe behavior. In the IJ's analysis on AR-91, the IJ does not reasonably consider this specific symptoms and behavior as part of her analysis of individualized risk. Second issue. On risk of torture, once Mr. Costa Suarez is detained, the IJ only focuses her analysis on poor conditions and facilities without ever meaningfully considering or discussing the evidence of affirmative abuse. And for that reason, we respectfully request the court grant our petition for review. Thank you, counsel. Thank you for your participation in this case. We're going to take this matter under advisement. We're going to take about a 10 minute break before we come back to hear our last argument.
judges: GRABER, CLIFTON, CHRISTEN